**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| RYAN A. JOHNSON **)** <br> 4931 N Melvina Avenue **)** <br> Chicago, Illinois 60630 **)** <br> **)** <br> *Plaintiff,* **)** <br> **)** <br> v. **)** <br> **)** <br> ASTRAZENECA PHARMACEUTICALS **)** <br> LP **)** <br> 633 Research Drive **)** <br> Frederick, Maryland 21703 **)** <br> **)** <br> Serve: **)** <br> **)** <br> Registered Agent: The Corporation Trust **)** <br> Incorporated **)** <br> 2405 York Road **)** <br> Suite 201 **)** <br> Lutherville Timonium, Maryland 21093- **)** <br> 2264 **)** <br> **)** <br> *Defendant* **)** <br> **)** <br> **)** | **Civil Action No. 1:26-cv-2331** |

<u>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**</u>

Plaintiff, Ryan Johnson (hereinafter "Mr. Johnson" or "Plaintiff") by and through counsel, Eric L. Siegel and James E. Miller of Eric Siegel Law, PLLC, hereby brings this action against Defendant AstraZeneca Pharmaceuticals LP (hereinafter "AstraZeneca" or "Defendant") for declaratory and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices, including its discriminatory disparate treatment of Plaintiff due to his disability, its failure to provide a reasonable accommodation for his disabilities, and its unlawful retaliation against him after he sought accommodations and/or complained about unlawful

1

discrimination and filed charges with the Equal Employment Opportunity Commission ("EEOC") and Maryland Commission on Civil Rights ("MCCR"), in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments Act of 2008, and the Maryland Fair Employment Practices Act ("MFEPA")

## PARTIES

1.     Plaintiff Ryan A. Johnson resides at 4931 N Melvina Avenue, Chicago, Illinois 60630. At all relevant times, Mr. Johnson was employed by Defendant AstraZeneca Pharmaceuticals LP, most recently as a Manufacturing Associate at Defendant's facility located at 633 Research Drive, Frederick, Maryland 21703. Mr. Johnson was employed by AstraZeneca from February 2014 until his termination on December 13, 2024. Mr. Johnson has two relevant disabilities: epilepsy and ulcerative colitis.

2.     At all times relevant hereto, Plaintiff was an employee in good standing at AstraZeneca.

3.     Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca") is a limited partnership with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware 19850. Defendant employs 501 or more employees and is an "employer" within the meaning of the Americans with Disabilities Act. AstraZeneca operates a facility located at 633 Research Drive, Frederick, Maryland 21703, at which Plaintiff was employed.

4.     At all times relevant to this action, Defendant was Plaintiff's "employer" within the meaning of the Americans with Disabilities Act and Maryland Fair Employment Practices Act.

5.     At all times relevant to this action, Plaintiff was an "employee" within the meaning of the Americans with Disabilities Act and Maryland Fair Employment Practices Act.

2

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 and 1343, because this action arises under the laws of the United States, specifically the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101, *et seq.*, including 42 U.S.C. § 12117, which incorporates by reference § 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5, to remedy acts of employment discrimination perpetrated against Plaintiff by Defendant.

7.     This Court has supplemental jurisdiction over Plaintiff's claims under the Maryland Fair Employment Practices Act ("MFEPA"), State Government Article § 20-601 et seq., under 28 U.S.C. § 1367, because those claims form part of the same case or controversy as Plaintiff's federal claims under the Americans with Disabilities Act. Plaintiff's MFEPA claims arise from the same nucleus of operative facts as his ADA claims — namely, AstraZeneca's alleged disability discrimination, failure to accommodate, and retaliation against Plaintiff during his employment at AstraZeneca's Frederick, Maryland facility.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant AstraZeneca Pharmaceuticals LP maintains the facility where Plaintiff was employed at 633 Research Drive, Frederick, Maryland 21703, and a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

9.     Defendant is subject to personal jurisdiction in this District. Defendant has been and is committing the acts or omissions alleged herein in this District that have caused the injuries and violated the rights of Plaintiff. A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

**EXHAUSTION OF ADMINISTRATIVE PROCEDURES**

10.     Prior to filing this Complaint, Plaintiff filed a Charge of Discrimination with the Maryland Commission on Civil Rights ("MCCR") and dual-filed with the Equal Employment Opportunity Commission ("EEOC"), which was assigned EEOC Charge Number 531-2023-03990. The charge was originally filed in July 2023 and was amended on November 29, 2023, and again on October 21, 2024. The charge alleged disability discrimination based on unfavorable terms and conditions of employment, denial of reasonable accommodation, and denial of promotion, in violation of the Americans with Disabilities Act.

11.     The MCCR completed its investigation and issued a written finding on March 13, 2026. Thereafter, the EEOC, on April 15, 2026, issued a Determination and Notice of Rights (Notice of Right to Sue) to Plaintiff with respect to EEOC Charge Number 531-2023-03990. Plaintiff has timely filed this Complaint within ninety (90) days of receipt of the EEOC's Notice of Right to Sue and has therefore exhausted his administrative remedies with respect to the claims set forth in Count I, Count II, Count IV, and Count V of this Complaint.

12.     Prior to filing this Complaint, Plaintiff filed a second Charge of Discrimination with the EEOC on August 1, 2025, which was assigned EEOC Charge Number 531-2025-02046. The second charge alleged disability discrimination and retaliation related to Plaintiff's termination on December 13, 2024, and AstraZeneca's conditioning of his severance benefits on the release of his pending discrimination claims. More than 180 days have elapsed since the filing of the second charge without the EEOC having completed its investigation. The EEOC issued a Notice of Right to Sue for this claim on May 27, 2026. Plaintiff has therefore exhausted his administrative remedies with respect to the claims set forth in Count III and Count VI of this Complaint.

**FACTUAL ALLEGATIONS**

**Mr. Johnson's Background and Employment with AstraZeneca**

13.     Mr. Johnson began his employment with AstraZeneca directly in February 2014 after having been a temp since July 2013.  He was promoted to a Technician 2 by 2016.

14.     Throughout the course of his employment, Mr. Johnson received annual performance evaluations. Generally, these reviews were positive. However, oftentimes, the score awarded was not reflective of the actual language in the evaluation.

15.     In 2017, Mr. Johnson's disability was specifically noted in his performance evaluation when it was noted that he had five Sick Days for the year and AstraZeneca's policy was to limit Sick Day events to no more than six per year. Mr. Johnson's disability caused him to take a Sick Day.

16.     The same occurred in 2018, when it was noted that Mr. Johnson had 12 Sick Day events, in violation of that same six Sick Day policy.  This was despite Defendant's knowledge of Plaintiff's disability.

17.     Based upon his performance and time on the job, as well as his observations of others' professional growth, he should have been a Technician 3 by approximately 2019, but he was not promoted because, in part, his disability-related sick leave was held against him in his performance evaluations.

18.     On or about March 1, 2020, AstraZeneca changed his role and job duties to Manufacturing Associate due to a disability he had because his seizures were too dangerous for him to continue his work on the factory floor.  As part of a reasonable accommodation, AstraZeneca moved Mr. Johnson laterally to a Manufacturing Associate position as a technical writer in the Tech Ops team (though he no longer received overtime, so the job actually paid less).

19.     Prior to being pulled off the floor, Mr. Johnson had been in his role, Production Technician 2, a Rank B role, for almost 4 years.  He had already been in the industry for six years. Rank B roles are generally for people with 3-5 years of experience, with the next rank, Rank C, typically with 3-7 years of experience.

20.     At the time that Mr. Johnson was pulled off the floor due to his disability (Epilepsy) which made it too dangerous to keep him on the factory floor, he was applying for Technician 3 (Rank C) positions and had not been selected.

21.     The repositioning from the floor to a technical writer was mutually agreed upon due to the dangers of working with heavy machinery and steam, along with the issues of breaking sterility when ambulances came to retrieve him.  However, the creation of a new role without the ability to promote was not agreed upon and not known to Mr. Johnson.

22.     The Tech Ops team consisted exclusively of roles Rank D or higher. When Mr. Johnson was moved into the accommodated position, a previously retired position was opened for him that was equal to his previous position, putting him two ranks below everyone else on that team.

23.     While this was somewhat understandable, as this was meant to be a lateral move, he discussed the situation with his management, Jason Vincent and Jameson Walsh, to confirm that there was a path forward to reach an equal role and what would be needed to be done to achieve it.  He also discussed how he had been qualified for Rank C positions already, had been applying to them prior to being transferred and was denied each time for a Rank C position.

**AstraZeneca Delays Mr. Johnson's PAS-X Training, Further Blocking His Promotion**

24.     To be promoted, Mr. Johnson was given a list of qualifications that he needed to meet.  He met all of the ones he could qualify for on his own within a short period of time.

25.     One qualification, however, would require a trainer from his team to give him training in "PAS-X."

26.     AstraZeneca unnecessarily delayed doing this training *for over two years* even though Mr. Johnson made it clear how critical the training was for him.  He asked the trainers, primarily Christina Vossler and Hilary Waters, about starting the PAS-X training, and also asked Phil Pennington, about starting training no less than once a week for many months.

27.     He was always told, in reply, they would do it sometime "next month" even though this was not true over this two-year period.

28.     This training was finally assigned to Mr. Johnson in January of 2020, but the training was not set up, meaning there was no curriculum even established until January of 2022.

29.     Ultimately, Mr. Johnson was unable to complete the training until September of 2022 due to having other primary roles relating to keeping the company compliant with regulations and mitigating supply shortages that required his constant work effort.

30.     Mr. Johnson discussed this conflict with needed training with his managers, Jameson Walsh and later Kyle Lebo, who told him that it was considered a greater priority for him to continue his current role rather than take the training (despite the fact that it would impede Mr. Johnson's ability to be promoted).

31.     By the time Mr. Johnson filed an EEO claim in July 2023, he had not used the skillset from the training at all and would not be assigned tasks to use that training regularly until 2024.  When he was finally assigned work to use it in 2024, he was attending the meetings and performing the tasks of Rank D personnel, a rank higher than his own, in addition to his own tasks.

32.     There are other people on his team who are Rank D and above who did not have, and were not required to have, this training. It has never been critical to his role, and Defendant's management did not change Mr. Johnson's job assignments to match his acquired new skill.

33.     After he had the training in September 2022, Mr. Johnson had the pre-requisite skills and started applying for Rank D roles again.  After not being interviewed for four separate job vacancies (some of these were prior to September 2022), Mr. Johnson asked his supervisor, Kyle Lebo, why he was not being interviewed.

34.     After years of stalling, the truth finally came out – Mr. Lebo told Mr. Johnson that he was not being considered for equal positions because he was a Rank B, and the position was a Rank D, two ranks higher.

35.     Mr. Johnson was also told at that time that Defendant does not let people skip Rank C.  However, this is not entirely true; as Mr. Johnson was made aware that there have been cases of people skipping from Rank B to Rank D, even if they are rare.

36.     Mr. Johnson reminded Mr. Lebo that there were no Rank C positions on his team, the Rank B position had been reopened specifically for him, and Rank C positions were only available on the Manufacturing floor.  Unfortunately, there was nothing between Ranks B and D on his team at that time.  Therefore, there was no way for him to be promoted according to what AstraZeneca told him.

**Mr. Johnson Complains to HR About Discriminatory Treatment**

37.     Shortly thereafter, Mr. Johnson went to Defendant's Human Resource Department ("HR") to discuss his discriminatory treatment and non-selections, confirming that he was not being considered for the Rank D position because he was a Rank B.  He further discussed the issue

that there was no Rank C, thereby preventing him from being promoted, despite being told that he would be able to move to a Rank D due to the circumstances.

38.     Mr. Johnson told the HR person that he wanted the Rank D position but would accept a Rank C position with a clear, defined schedule/deadline to become a Rank D, since this was apparently a mistake with how Defendant had set the disability accommodation position up in Defendant's HR system.

39.     After HR deliberated for a few weeks, Kristin Walmer, from site HR, and an outside HR agent contacted Mr. Johnson on October 4, 2022, during which they declared that the company had not made a mistake and that they would not be promoting him to a Rank C or D position.

40.     HR created a Rank C position on Mr. Johnson's team and told him he could start applying for it "in 9+ months," ignoring that he had been on the team for almost *3 years*.  As stated earlier, a Rank C position is expected to have 3-7 years of experience.  By this point, Mr. Johnson had 9+ years of experience.

41.     At this time, Defendant's management gave Mr. Johnson a rough outline that stated that a promotion would happen in a full year or more, but, "with excellent performance," he could start applying as early as 9 months from that point in time.  Mr. Johnson was told by management that the company wanted someone to be in a role before their next promotion is possible for about one year.

42.     In a meeting on July 26, 2023, about 10 months after the initial meeting, Mr. Johnson's associate director, Angie Stillisano, told him that the earliest she would consider a promotion would be November, which was 13 months after the meeting with HR, almost 4 years after he had joined the team, and 10 years into his career.

43.     Ms. Stillisano stated this was regardless of performance because he had to show "sustained performance" and that "six months was not sufficient to make the determination."

44.     Ms. Stillisano also told Mr. Johnson that once he got the Rank C position, it would be a minimum of 18 months before he could realistically apply for a Rank D position, which was 50% longer than the standard time. Ms. Stillisano did not provide a reason why Mr. Johnson's promotion path would take longer than non-disabled employees.

45.     Based on this proposed path to promotion, Mr. Johnson would be over 12 years into his career to apply for a position where the required experience is half that (Rank D positions require 5-7 years of experience).

46.     As of December 2024, when Mr. Johnson was ultimately "laid off," he had not received the promotion to Rank C over 2 years after he contacted HR regarding the issue.

47.     Shortly before being "laid off,"  Mr. Johnson was told that it would be another six months for a promotion.  This means that promoting Mr. Johnson would have taken two-and-a-half years from when he brought the issue to the attention of HR and 4.5 years after moving into the role on his team.

48.     Mr. Johnson was one of the highest performers on the floor. AstraZeneca's B633 Central Services Manufacturing Team had a four-team structure, with each team having 13 members on average.  Despite not holding a lead position (a Rank D position), Mr. Johnson was frequently within the team considered the lead within the area he ran.

49.     In advocating for himself to be promoted, Mr. Johnson pulled the metrics from the company logbooks, showing that under his leadership, his team, O-Days Central Services, was responsible for 40% of production activities in the COP, SOP, Washer, and Autoclave Areas, based on signatures in logbooks. Within those metrics, he was involved in at least half of the operations,

based on signatures. During this time, people with less experience than Mr. Johnson, including some people he trained, continued to get promoted over him.

50.    Likewise, when moving to his new team, Mr. Johnson was involved in an experimental team designed to address COVID-related issues. This team consisted of people in Rank D and E positions that were considered the top of the staff at the AstraZeneca Frederick Manufacturing Site.  Several people on this team had 15+ years of experience, some had 20+ years of experience.  Mr. Johnson was the only person in a B position, and there were no people in C positions.  In other words, he was the lowest-ranked person on his team yet was performing at a high level.

51.    During this time, Mr. Johnson saved the company over 5 million dollars in a single event in a project he was the primary lead on by preventing supply stockouts that would have disrupted operations, requiring the company to work out of compliance or not at all.

**AstraZeneca Denies Mr. Johnson's Request for Full-Time Work-From-Home Accommodation**

52.    Additionally, AstraZeneca has made it incredibly difficult to report properly Reasonable Accommodations ("RA") under the FMLA and ADA, which are handled by Defendant through the initial paperwork filed with MetLife.  MetLife does a terrible job with this, but it is still AstraZeneca that is the decision maker.

53.    Since January 2023, Mr. Johnson has been attempting to get an RA that would allow him to work from home most of the time as a result of his Colitis.

54.    AstraZeneca pushed back on Mr. Johnson's requests to work from home, despite two physicians stating such an accommodation was necessary and despite the fact that Mr. Johnson successfully worked from home for the duration of the COVID pandemic with no impact to his job performance.

55.     After going through several obstacles, Defendant approved an accommodation that would only allow Mr. Johnson to work at home only sometimes.

56.     The initial approval from MetLife, in which they only confirm that they have the paperwork they need, was on August 23, 2023.  The paperwork was then forwarded to Defendant AstraZeneca for further processing.  AstraZeneca's HR initially tried to only allow Mr. Johnson to work from home three to four times *a year*, aligning with the time that would be needed to take off per the FMLA paperwork.

57.     Defendant responded that Mr. Johnson should show up on site when not experiencing active symptoms. Mr. Johnson pushed back because previously when work from home was being phased out, the agreement with his manager, Jameson Walsh, was that he would work on site when being on site was directly beneficial for the tasks being done, and could work from home the remainder of the time.

58.     By November 1, 2023, AstraZeneva approved an accommodation for Mr. Johnson, although not the one he asked for.  He was approved to work from home any day he was experiencing active symptoms.  This would mean that the accommodation being made did not prevent the condition from becoming active, which was one of the reasons Mr. Johnson wanted to work remotely and had requested this accommodation.

59.     The following year, the necessary RA paperwork along with related FMLA paperwork was submitted again at the beginning of the year to Metlife, as required, and then later at mid-year because AstraZeneca stated that Mr. Johnson was taking too much remote work time, despite the fact that there was no change in his positive job performance.

60.     There were initial issues with MetLife prematurely closing Mr. Johnson's case within three days of the case being opened. This is not even enough time for his paperwork to have

arrived in the mail, let alone being filled out by a doctor.  Mr. Johnson contacted MetLife to have his cases reopened and submitted the paperwork again.

61.    In mid-2024, it was brought to Mr. Johnson's attention that AstraZeneca had not received the accommodation paperwork from MetLife, and that his RA would be revoked if it was not received soon.

62.    Mr. Johnson discovered that MetLife did not reopen the case and instead attached the resubmitted paperwork to an incorrect case.  After clearing this issue, MetLife submitted the RA request to AstraZeneca.

63.    This also took a while to approve.  Ultimately, Mr. Johnson was approved to work remotely four days a week  on November 19, 2024 (an accommodation better than previously provided), validating the need for this accommodation since there had been little to no change to his actual disability condition.

64.    In discussing his experience with others with disabilities, Mr. Johnson has determined that he was not the only person at AstraZeneca who has faced difficulties in obtaining accommodations.

65.    He has been informed that others' experiences involve MetLife losing paperwork, closing cases randomly, and failing to inform employees that the paperwork was missing. They also had paperwork rejected because of arbitrary issues, such as MetLife not accepting that a disability could not be "lifelong."

**AstraZeneca Terminates Mr. Johnson After He Files MCCR and EEOC Charges and Conditions Severance on Release of Mr. Johnson's Discrimination Claims**

66.    On December 13th, 2024, Mr. Johnson was "laid off" by AstraZeneca. Mr. Johnson was included in these layoffs despite his position having an active recruitment on LinkedIn on September 30, 2024, less than two months prior to being informed he would be laid off, which

13

occurred during the last week of November 2024. This was in spite of the vital nature of Mr. Johnson's role.

67.    Mr. Johnson's notification of being laid off was also very close in time to when Mr. Johnson obtained legal counsel in October 2024 and amended his EEO claims with the Montgomery County Civil Rights office.

68.    Additionally, Mr. Johnson received word of his layoff only a day after he received an approval for his reasonable accommodation, which he had been trying to obtgain for the entirety of the calendar year.

69.    In addition to learning that others had faced issues obtaining accommodations, Mr. Johnson also observed at least one other person that was fired for issues tied to their disability. Specifically, someone came back from short-term disability leave and their position had been backfilled, meaning they lost their original position. The person was then given a temporary position of equal status to the prior position, but it was never made permanent, nor was the person ever offered a permanent position. Instead, AstraZeneca waited until the temporary position expired and let her go.

70.    During this so-called layoff, Mr. Johnson was given a severance agreement to sign that stated that, in order to receive the severance benefits that other employees would receive, he was required to sign an agreement to end his ongoing MCCR charge or any related EEO lawsuit against AstraZeneca.

71.    Moreover, when Mr. Johnson contacted HR about his unwillingness to end his ongoing MCCR claim and requested an amended severance agreement that allowed him to pursue his ongoing MCCR case, he was ignored until after the time of his termination.

72.    AstraZeneca informed Mr. Johnson, through his attorneys, that they would not give a severance agreement that allowed Mr. Johnson to continue his ongoing EEO claims, putting him in a situation where he is being denied the severance given to every other employee simply because of his ongoing and known discrimination claims.

**FIRST CAUSE OF ACTION**
**DISABILITY DISCRIMINATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990**
**42 U.S.C. § 12101, *et seq.***
**(EEOC Charge No. 531-2023-03990 — Disparate Treatment, Terms and Conditions, and Promotion Denial)**

73.    Plaintiff realleges and reincorporates by reference Paragraphs 1 through 72 as if fully alleged herein.

74.    The ADA prohibits employers from discriminating against a qualified individual on the basis of disability with respect to job application procedures, hiring, advancement, discharge, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

75.    Mr. Johnson is a qualified individual with a disability. He suffers from epilepsy and ulcerative colitis, both of which substantially limit major life activities. AstraZeneca was aware of his disabilities shortly after he was hired in February 2014.

76.    Mr. Johnson carried out his responsibilities as a Manufacturing Associate – including technical writing, batch record support, tech transfer initiatives, and related project work – with professionalism and competence throughout his tenure on the Tech Ops team.

77.    Defendant discriminated against Mr. Johnson on the basis of his disability by, among other ways, subjecting him to unfavorable terms and conditions of employment to intentionally prevent his advancement and promotion opportunities. Specifically:

15

a. Before AstraZeneca reassigned him from the factory floor, Mr. Johnson's disability-related sick leave was held against him in his performance evaluations in 2017 and 2018, directly contributing to the denial of his promotion to Technician 3 in 2019.

b. On or about March 1, 2020, AstraZeneca moved Mr. Johnson laterally into a Manufacturing Associate position – a previously retired Rank B role reopened specifically for him – that placed him two ranks below every other employee on the Tech Ops team. This both eliminated an employment promotion opportunity and a privilege of employment.

c. Mr. Johnson applied for the Specialist role (Rank D) but was rejected on multiple occasions, including in September 2019, August 2022, and September 2022, while similarly situated non-disabled employees with less experience and shorter tenure were promoted to Rank D. AstraZeneca also hired external candidates who had less experience than Mr. Johnson. He was told that he was denied because of his rank at the time.

d. After Mr. Johnson raised the issue with HR in October 2022, AstraZeneca created a Rank C (Senior Manufacturing Associate) position but continued to delay his promotion by giving him a false timeline and false set of criteria to meet in order to obtain the role, despite prior commitment, experience, positive performance evaluations and service.

e. Associate Director Angie Stillisano informed Mr. Johnson that his promotion timeline would be extended 50% beyond the standard promotion period – to a minimum of eighteen months after receiving the Rank C position before applying for Rank D – without any justification for the differential treatment.

16

f.     The PAS-X training assigned to Mr. Johnson on January 29, 2020, was deliberately delayed and not completed until September 1, 2022, in part because the PAS-X designers were specifically told to de-prioritize training Mr. Johnson. This training delay contributed to the delays in his promotion.

78.     As a direct and proximate result of Defendant's unlawful disability discrimination against Mr. Johnson, he has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, including lost wages at the Rank C and Rank D salary levels, for which he is entitled to an award of monetary damages and other relief. 42 U.S.C. § 12117(a); 42 U.S.C.S. § 2000e-(5)(g)(1).

79.     As a direct and proximate result of Defendant's unlawful disability discrimination against Mr. Johnson, he has suffered and continues to suffer damages for loss of future earning capacity, damage to his professional reputation, and severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief. 42 U.S.C. § 1981a-(a)(2).

80.     Defendant's unlawful discriminatory conduct was willful, malicious, and done with conscious disregard of Mr. Johnson's civil rights, entitling Plaintiff to an award of punitive damages. 42 U.S.C. § 1981a-(b)(1).

81.     Plaintiff also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this matter. 42 U.S.C. § 12117(a); 42 U.S.C.S. § 2000e-5(k).

**SECOND CAUSE OF ACTION**
**FAILURE TO PROVIDE REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990**
**42 U.S.C. § 12101, *et seq.***
**(EEOC Charge No. 531-2023-03990 — Reasonable Accommodation)**

82.     Plaintiff realleges and reincorporates by reference Paragraphs 1 through 72 as if fully alleged herein.

83.     The ADA requires employers to provide reasonable accommodations to employees with disabilities unless the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5).

84.     Mr. Johnson is a qualified individual with a disability who suffers from ulcerative colitis that required him to request the accommodation of working remotely on a full-time basis in order to manage his medical condition.

85.     When an employer learns an employee needs an accommodation, the parties must engage in an "interactive process." 29 C.F.R. § 1630.2(o)(3).

86.     Beginning in January 2023, Mr. Johnson formally requested that AstraZeneca permit him to work remotely on a full-time basis as a reasonable accommodation for his ulcerative colitis. AstraZeneca denied this request.

87.     On November 1, 2023, nearly a year after initially requesting the accommodation, AstraZeneca granted only a limited accommodation, permitting Mr. Johnson to work remotely solely on days when he was "experiencing active symptoms" of his medical condition. This accommodation was unreasonable and ineffective because Mr. Johnson's condition required preventive remote work arrangements to avoid symptom onset, not merely reactive remote work days after symptoms had already occurred.

88.     AstraZeneca's ineffective accommodation forced Mr. Johnson to commute to the office in direct contravention of his medical needs and in a manner that exacerbated his medical

condition. No explanation was provided for how this accommodation, in full, would have imposed undue burden on Defendant, given the nature of Mr. Johnson's work assignments.

89.    Because AstraZeneca required annual renewal of accommodations, and because the original request took so long, in 2024, Mr. Johnson resubmitted RA paperwork and FMLA paperwork. Again, processing took nearly *a full year*.

90.    During the accommodation process in 2024, MetLife improperly closed Mr. Johnson's accommodation cases and attached paperwork to incorrect accounts without informing him, further denying him the benefit of a timely and effective accommodation interactive process.

91.    Notably, on November 19, 2024 – more than a year and a half after Mr. Johnson first requested the accommodation – AstraZeneca finally approved Mr. Johnson to work from home four days per week. The approval came only one day before AstraZeneca served him with a notice of termination.

92.    Defendant failed to engage in a good-faith interactive process with Mr. Johnson and failed to provide an effective and timely reasonable accommodation for his disability. Defendant has not demonstrated that providing the requested accommodation would impose an undue hardship.

93.    As a result of Defendant's failure to accommodate, Plaintiff has suffered and continues to suffer lost wages, exacerbation of his medical conditions, emotional distress, and other damages for which relief is requested. 42 U.S.C. § 12117(a); 42 U.S.C.S. § 2000e-(5)(g)(1); 42 U.S.C. § 1981a(a)(2).

94.    Plaintiff also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this matter. 42 U.S.C. § 12117(a); 42 U.S.C.S. § 2000e-5(k).

**THIRD CAUSE OF ACTION**
**RETALIATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990**
**42 U.S.C. § 12101,** *et seq.*
**(EEOC Charge No. 531-2025-02046 — Termination and Retaliatory Severance Condition)**

95.     Plaintiff realleges and reincorporates by reference Paragraphs 1 through 72 as if fully alleged herein.

96.     The ADA prohibits employers from retaliating against an employee because the employee has engaged in protected activity, including requesting a disability accommodation, filing a charge of discrimination, opposing discriminatory practices, or participating in an investigation of discrimination. 42 U.S. Code § 12203.

97.     Mr. Johnson engaged in protected activity by requesting a disability accommodation, making an official HR complaint regarding disability discrimination in October 2022, filing EEOC Charge No. 531-2023-03990 in July 2023, amending that charge on November 29, 2023, retaining legal counsel and filing a further amended charge on October 21, 2024.

98.     Defendant AstraZeneca was aware of Mr. Johnson's protected activity. AstraZeneca was actively engaged in the MCCR/EEOC proceedings under Charge No. 531-2023-03990 prior to and through October 2024 and was well aware of Mr. Johnson's claims and the potential liability at the time it decided to terminate his employment.

99.     Defendant retaliated against Mr. Johnson by, among other actions:

   a. Terminating Mr. Johnson's employment on November 20, 2024, effective December 13, 2024, just one day after his long-sought remote work accommodation was finally approved on November 19, 2024, and just one month after he retained counsel and filed an amended MCCR/EEOC charge in October 2024. Defendant has asserted that Mr. Johnson was terminated as part of a group "redundancy" action.

b. Including Mr. Johnson in the so-called "layoff" despite Mr. Johnson's position being actively recruited on September 30, 2024, just weeks before the termination notice.

c. Conditioning Mr. Johnson's receipt of severance benefits upon his release of his pending MCCR/EEOC discrimination claims and refusing to carve out his pending claims from the severance agreement's general release. AstraZeneca expressly refused to allow Mr. Johnson to receive the severance benefits that other laid-off employees received unless he agreed to end his ongoing discrimination case against the company.

d. Pressuring Mr. Johnson to sign the severance agreement by giving him a very short turn around time over the holidays and ignoring him when he brought up this issue. He only received a response when his counsel contacted HR.

100. The temporal proximity of Mr. Johnson's protected activity and termination support an inference that the events were causally connected. *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022).

101. As a direct and proximate result of Defendant AstraZeneca's unlawful retaliatory conduct, Mr. Johnson has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, the loss of severance benefits he would have received but for his refusal to abandon his discrimination claims, loss of 401(k) employer contributions, housing loss from the forced sale of his home at a financial loss, and relocation costs, for which he is entitled to an award of monetary damages and other relief. 42 U.S.C. § 12117(a); 42 U.S.C.S. § 2000e-(5)(g)(1).

102. As a direct and proximate result of Defendant AstraZeneca's unlawful retaliatory conduct, Mr. Johnson has suffered and continues to suffer damages for loss of future earning capacity, damage to his professional reputation, and severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief. 42 U.S.C. § 1981a-(a)(2).

103. Defendant AstraZeneca's unlawful retaliatory conduct was willful, malicious, and done with conscious disregard of Mr. Johnson's civil rights, entitling Plaintiff to an award of punitive damages. 42 U.S.C. § 1981a-(b)(1).

104. Plaintiff also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this matter. 42 U.S.C. § 12117(a); 42 U.S.C.S. § 2000e-5(k).

**FOURTH CAUSE OF ACTION**
**DISABILITY DISCRIMINATION**
**In Violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't**
**§ 20-606(a)(1)**

105. Plaintiff realleges and reincorporates by reference Paragraphs 1 through 72 as if fully alleged herein.

106. Disability discrimination is illegal under the Maryland Fair Employment Practices Act ("FEPA"), State Government Article ("SG") § 20-606. Specifically, employers may not "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of…the individual's…disability…" *Id.*

107. Maryland Courts analyze claims of disability discrimination under the FEPA under the same framework as the ADA. *See Miller v. Maryland Dep't of Nat. Res.,* 813 F. App'x 869, 874 (4th Cir. 2020); *Parker v. Child.'s Nat'l Med. Ctr., Inc.,* No. 1:20-cv-03523-JRR, 2024 U.S. Dist.

LEXIS 37918, at *56 (D. Md. Mar. 4, 2024); *Payne v. MedStar Health, Inc., No.*, CV RDB-21-2841, 2022 U.S. Dist. LEXIS 224368, 2022 WL 17584375, at *5 (D. Md. Dec. 12, 2022).

108.    Mr. Johnson is a qualified individual with a disability. He suffers from epilepsy and ulcerative colitis, both of which substantially limit major life activities. AstraZeneca was aware of his disabilities shortly after he was hired in February 2014.

109.    Mr. Johnson carried out his responsibilities as a Manufacturing Associate – including technical writing, batch record support, tech transfer initiatives, and related project work – with professionalism and competence throughout his tenure on the Tech Ops team.

110.    Defendant discriminated against Mr. Johnson on the basis of his disability by, among other ways, subjecting him to unfavorable terms and conditions of employment to intentionally prevent his advancement and/or promotion. Specifically:

a.    Before AstraZeneca reassigned him from the factory floor, Mr. Johnson's disability-related sick leave was held against him in his performance evaluations in 2017 and 2018, directly contributing to the denial of his promotion to Technician 3 in 2019.

b.    On or about March 1, 2020, AstraZeneca moved Mr. Johnson laterally into a Manufacturing Associate position – a previously retired Rank B role reopened specifically for him – that placed him two ranks below every other employee on the Tech Ops team. This both eliminated an employment opportunity/promotion and a privilege of employment.

c.    Mr. Johnson applied for the Specialist role (Rank D) but was rejected on multiple occasions, including in September 2019, August 2022, and September 2022, while similarly situated non-disabled employees with less experience and shorter tenure were promoted to Rank D. AstraZeneca also hired external candidates who had less

23

experience than Mr. Johnson. He was told that he was denied because of his rank at the time.

d. After Mr. Johnson raised the issue with HR in October 2022, AstraZeneca created a Rank C (Senior Manufacturing Associate) position but continued to delay his promotion by giving him a false timeline and false set of criteria to meet in order to obtain the role, despite prior commitment, experience, and service.

e. Associate Director Angie Stillisano informed Mr. Johnson that his promotion timeline would be extended 50% beyond the standard promotion period – to a minimum of eighteen months after receiving the Rank C position before applying for Rank D – without any justification for the differential treatment.

f. The PAS-X training assigned to Mr. Johnson on January 29, 2020, was deliberately delayed and not completed until September 1, 2022, in part because the PAS-X designers were specifically told to de-prioritize training Mr. Johnson. This delay continued to delay any prospect of promotion.

111. As a direct and proximate result of Defendant's unlawful disability discrimination against Mr. Johnson, he has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, including lost wages at the Rank C and Rank D salary levels, for which he is entitled to an award of monetary damages and other relief. Md. Code Ann., State Gov't § 20-1013(d); § 20-1009(b)(3).

112. As a direct and proximate result of Defendant's unlawful disability discrimination against Mr. Johnson, he has suffered and continues to suffer damages for loss of future earning capacity, damage to his professional reputation, and severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem

and self-confidence, and emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief. Md. Code Ann., State Gov't § 20-1013(d); § 20-1009(b)(3).

113.   Defendant's unlawful discriminatory conduct was willful, malicious, and done with conscious disregard of Mr. Johnson's civil rights, entitling Plaintiff to an award of punitive damages. Md. Code Ann., State Gov't § 20-13(e)(1)(ii).

114.   Plaintiff also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this matter. Md. Code Ann., State Gov't § 20-1015.

## FIFTH CAUSE OF ACTION
## FAILURE TO ACCOMODATE
## In Violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't 20-606(a)(4)

115.   Plaintiff realleges and reincorporates by reference Paragraphs 1 through 71 as if fully alleged herein.

116.   The MFEPA prohibits an employer's failure to provide reasonable accommodation to a qualified individual with a disability, Md. Code Ann., State Gov't 20-606(a)(4), and courts analyze MFEPA failure-to-accommodate claims under the same framework as ADA claims. *See Miller*, 813 F. App'x at 874; *Parker*, 2024 U.S. Dist. LEXIS 37918, at *56.

117.   Plaintiff has a disability that substantially limits major life activities and that Defendant has had notice of throughout his employment. With reasonable accommodation, Plaintiff could perform, and did perform, the essential functions of his position. During the COVID-19 pandemic, Plaintiff worked remotely and did so successfully with no impact to his positive performance.

118.   Defendant failed to accommodate Plaintiff in two distinct respects. First, when Defendant transferred Plaintiff to the Tech Ops team in March 2020 as an accommodation for his

25

epilepsy, it placed him in a Rank B position with no promotional pathway – effectively denying him the employment opportunity and privilege of career advancement that he had when working on the manufacturing floor.

119. Second, beginning in January 2023, Plaintiff requested a reasonable accommodation to work remotely the majority of the time due to his ulcerative colitis, supported by two treating physicians. Defendant, through its third-party administrator MetLife, repeatedly failed to process Plaintiff's requests in good faith – prematurely closing cases, misrouting paperwork, and failing to communicate deficiencies to Plaintiff. When a partial accommodation was finally granted in November 2023, nearly a year later, Defendant approved remote work only during active symptom flares, rather than the preventive accommodation requested. Defendant provided no justification for why the full requested accommodation would pose an undue hardship.

120. Just shortly thereafter, in January and February 2024, Plaintiff was already required to resubmit accommodation paperwork for annual recertification. After nearly another full year of administrative obstacles, Defendant approved four days of remote work per week on November 19, 2024, demonstrating the feasibility of the accommodation it had denied for nearly two years. Defendant approved this accommodation one day before notifying Plaintiff of his termination, effectively ensuring Defendant never had to honor it.

121. Throughout this process, Defendant failed to engage in the interactive process in any meaningful way, denied Plaintiff's requested accommodations without justification, and delayed the process such that Plaintiff was deprived of necessary accommodations for extended periods of time.

122. As a result of Defendant's failure to accommodate, Plaintiff has suffered and continues to suffer lost wages, exacerbation of his medical conditions, emotional distress, and other damages for which relief is requested. Md. Code Ann., State Gov't § 20-1013(d); § 20-1009(b)(3).

123. Plaintiff also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this matter. Md. Code Ann., State Gov't § 20-1015.

**SIXTH CAUSE OF ACTION**
**RETALIATION**
**In Violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't**
**§ 20-606(f)**

124. Plaintiff realleges and reincorporates by reference Paragraphs 1 through 72 as if fully alleged herein.

125. The MFEPA prohibits retaliation against any individual who opposes an act or practice made unlawful under the Act. Md. Code Ann., State Gov't § 20-606(f). Courts analyze MFEPA retaliation claims under the same framework as ADA retaliation claims. *Nelson-Rogers v. Permanente*, No. GJH-17-3326, 2020 U.S. Dist. LEXIS 32335, at *36 (D. Md. Feb. 25, 2020).

126. Plaintiff engaged in protected activity by requesting a disability accommodation and filing a Charge of Discrimination with the EEOC and the Maryland Commission on Civil Rights ("MCCR"), EEOC Case No. 531-2023-03990, alleging disability discrimination and failure to accommodate, with charges initially filed in 2023 and amended in October 2024.

127. Defendant AstraZeneca was aware of Mr. Johnson's protected activity. AstraZeneca was actively engaged in the MCCR/EEOC proceedings under Charge No. 531-2023-03990 by October 2024 and was well aware of Mr. Johnson's claims and the potential liability at the time it decided to terminate his employment.

128. Defendant retaliated against Mr. Johnson by, among other actions:

a. Terminating Mr. Johnson's employment on November 20, 2024, effective December 13, 2024, just one day after his long-sought remote work accommodation was finally approved on November 19, 2024, and just one month after he retained counsel and filed an amended MCCR/EEOC charge in October 2024.

b. Including Mr. Johnson in a so-called "layoff" without considering whether his function was essential for operations, despite Mr. Johnson's position being actively recruited on September 30, 2024, just weeks before the termination notice.

c. Conditioning Mr. Johnson's receipt of severance benefits upon his release of his pending MCCR/EEOC discrimination claims and refusing to carve out his pending claims from the severance agreement's general release. AstraZeneca expressly refused to allow Mr. Johnson to receive the severance benefits that other laid-off employees received unless he agreed to end his ongoing discrimination case against the company.

d. Pressuring Mr. Johnson to sign the severance agreement by giving him a very short turnaround time over the holidays and ignoring him when he brought up this issue. He only received a response when his counsel contacted HR.

129.    The temporal proximity of Mr. Johnson's protected activity and termination support an inference that the events were causally connected. *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022).

130.    Mr. Johnson's protected activity was the but-for cause of the adverse actions taken against him by AstraZeneca, as demonstrated by the close temporal proximity of the events and the need for his position.

131.    As a direct and proximate result of Defendant AstraZeneca's unlawful retaliatory conduct, Mr. Johnson has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, the loss of severance benefits he would have received but for his refusal to abandon his discrimination claims, loss of 401(k) employer contributions, housing loss from the forced sale of his home at a financial loss, and relocation costs, for which he is entitled to an award of monetary damages and other relief. Md. Code Ann., State Gov't § 20-1013(d); § 20-1009(b)(3).

132.    As a direct and proximate result of Defendant AstraZeneca's unlawful retaliatory conduct, Mr. Johnson has suffered and continues to suffer damages for loss of future earning capacity, damage to his professional reputation, and severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief. Md. Code Ann., State Gov't § 20-1013(d); § 20-1009(b)(3).

133.    Defendant AstraZeneca's unlawful retaliatory conduct was willful, malicious, and done with conscious disregard of Mr. Johnson's civil rights, entitling Plaintiff to an award of punitive damages. Md. Code Ann., State Gov't § 20-13(e)(1)(ii).

134.    Plaintiff also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this matter. Md. Code Ann., State Gov't § 20-1015.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for the Court and/or Jury to:

A. Declare Defendant AstraZeneca's conduct of disability discrimination against Plaintiff Ryan A. Johnson to be in violation of the Americans with Disabilities Act and/or Maryland Fair Employment Practices Act;

B. Declare Defendant AstraZeneca's failure to provide a reasonable accommodation to Plaintiff Ryan A. Johnson in a timely manner or otherwise as requested to be in violation of the Americans with Disabilities Act and/or Maryland Fair Employment Practices Act;

C. Declare Defendant AstraZeneca's conduct of retaliation against Plaintiff Ryan A. Johnson to be in violation of the Americans with Disabilities Act and/or Maryland Fair Employment Practices Act;

D. Award to Plaintiff his economic and/or compensatory damages for Defendant's violations of the Americans with Disabilities Act and/or Maryland Fair Employment Practices Act in amounts to be proven at trial;

E. Award to Plaintiff back pay, including lost wages and benefits, for all periods in which he suffered the effects of Defendant's discrimination, failure to accommodate, and retaliation, in amounts to be proven at trial;

F. Award to Plaintiff front pay and/or reinstatement to a position commensurate with the rank and compensation he would have achieved but for Defendant's unlawful conduct;

G. Award to Plaintiff compensatory damages for emotional distress, mental anguish, pain and suffering, and damage to his professional reputation in amounts to be proven at trial;

H. Award to Plaintiff punitive damages against Defendant AstraZeneca in amounts to be proven at trial;

I. Award to Plaintiff his costs and reasonable attorneys' fees incurred in this action;

J. Award Plaintiff prejudgment and post-judgment interest as permitted by law; and

K.  Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff Ryan Johnson requests a trial by jury on all claims, issues of fact, and damages arising herein.

Dated: June 10, 2026                    Respectfully submitted,

ERIC SIEGEL LAW, PLLC

Eric L. Siegel
Eric L. Siegel (M.D. Bar No. 12805)
James E. Miller (M.D. Bar No 21519)
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
Tel: (771) 220-6116; (771) 220-6061
Email: esiegel@ericsiegellaw.com
jmiller@ericsiegellaw.com
*Attorneys for Plaintiff*